James M. SMITH, Appellant

v.

TOWNSHIP OF RICHMOND, Berks County, Pennsylvania, Gary J. Angstadt, Ronald L. Kurtz, and Donald H. Brumbach.

Commonwealth Court of Pennsylvania.

Argued May 15, 2012.

Decided Oct. 5, 2012.

James M. Smith, pro se.

Anthony R. Sherr, Blue Bell, for appellees.

BEFORE: LEADBETTER, Judge, and LEAVITT, Judge, and COLINS, Senior Judge.

Opinion by Judge LEAVITT.

James M. Smith, a resident who also practices law in the Township of Richmond, appeals an order of the Court of Common Pleas of Berks County (trial court), which denied his request for a declaratory judgment that the Board of Supervisors of Richmond Township had violated the Sunshine Act, 65 Pa.C.S. §§ 701–716.[1] The trial court concluded that the Supervisors' four closed-door meetings with the different parties interested in an ongoing litigation matter did not have to be conducted in public because they were held to collect general information about the parties' various concerns and not to consider settlement, which had not yet been proposed by any of the parties. Further, Smith presented no evidence that agency business was deliberated or official actions taken at these meetings. Discerning no error, we affirm.

The facts are undisputed. The Township has been engaged in litigation with the Lehigh Cement Company and the East Penn Valley Residents Group (Citizens Group) over the expansion of Lehigh Cement's limestone quarry in Richmond Township. In 2010, Ronald I. Kurtz joined Gary J. Angstadt and Donald H. Brumbach as a new member of the Richmond Township Board of Supervisors. In that same time frame, the Township hired a new solicitor, Christopher Hartman, Esquire. To educate Kurtz and the Solicitor on the litigation, the Supervisors decided to conduct a series of meetings with the interested parties. To that end, the Solicitor arranged four meetings with each of the respective parties. At the Supervisors' March 8, 2010, meeting, the Solicitor stated that the Supervisors would be conduct-

ing these meetings, which he called "executive sessions." [2]

As announced, the four meetings took place in early March, and they were attended by all three Supervisors and the Solicitor. On March 9, 2010, the Supervisors held two separate meetings with representatives from Maxatawny and Maidencreek Townships, which border Richmond Township. On March 11, 2010, the Supervisors met with representatives of the Citizens Group. Finally, on March 12, 2010, the Supervisors met with representatives of Lehigh Cement.

At the Board's next public meeting, on April 5, 2010, the Solicitor read an "open meeting statement" into the record, explaining that the previously announced "executive sessions" on the Lehigh Cement litigation had taken place as scheduled. The Solicitor explained that the Supervisors did not deliberate on, conduct, or make any decisions on agency business at any of the four meetings. The Solicitor reiterated that "the sole purpose of each of the executive sessions was for the Board of Supervisors to ask questions of the invited persons and to gather information regarding the impacts of a quarry operation in Richmond Township." Reproduced Record at 297a (R.R.).

At its next meeting on April 12, 2010, the Supervisors appointed Kurtz as their representative to join the Solicitor in meetings with Lehigh Cement to discuss a possible settlement. Thereafter, Kurtz and the Solicitor met with Lehigh Cement representatives. Smith does not assert that these settlement discussions violated the Sunshine Act.

---

1. The Pennsylvania Newspaper Association participated in this appeal as *amicus curiae*.

2. John H. Keiser, Jr., a member of the Citizens Group, questioned if the Citizens Group's attorney could attend the meetings and was told he could not.

On May 10, 2010, Lehigh Cement delivered a proposed settlement agreement to the Township's Solicitor, approximately 45 minutes before the Supervisors' regularly scheduled meeting. The proposed agreement was entirely the work product of Lehigh Cement and its counsel. Accordingly, the proposed settlement agreement had not been listed on the Supervisors' agenda for the meeting that evening. The Supervisors met in an executive session with the Solicitor to discuss the Lehigh Cement settlement proposal. Thereafter, the Solicitor read the entire settlement agreement proposal into the record. A spirited public comment and debate followed. In the early morning hours of May 11, 2010, at the conclusion of the public comment and debate, Kurtz moved to accept the settlement agreement, and his motion was seconded by Brumbach. The third supervisor, Angstadt, voted against the motion and the settlement. The motion carried.

On March 22, 2010, Smith filed a declaratory judgment action to challenge the validity of the Township's four meetings on grounds that they violated the Sunshine Act. Specifically, Smith's complaint alleged, in relevant part, as follows:

14. At each of the aforesaid closed meetings (collectively, the "Meetings"), a quorum of the Board [of Supervisors] discussed and deliberated on business related to Richmond Township.

15. The aforesaid Meetings were closed to the public in violation of Section 704 of the Sunshine Act, 65 Pa. C.S.A. § 701, et seq. and without falling under any of the statutory exceptions set forth in the Act.

16. The Board [of Supervisors'] conduct in meeting with representatives of neighboring municipalities, a property owner, and select members of a citizens' group, and restricting public access to these meetings constitutes a violation of the Sunshine Act, 65 Pa.C.S.A. § 701, et seq.

R.R. 5a–7a. The Supervisors denied Smith's allegations in their answer, stating that the meetings were held to gather information; did not involve any deliberations; and did not result in any official action being taken.

The parties did discovery. With respect to the two separate meetings with Maxatawny and Maidencreek Townships, discovery established that the Solicitor asked representatives of these townships about the dust and traffic generated by Lehigh Cement's quarry operations as well as its hours of operation. The goal was to learn how Lehigh Cement's operations impacted the neighboring townships and whether there were ways to mitigate any adverse impacts. All three Supervisors testified that the purpose of the meetings with Maxatawny and Maidencreek was informational.

Specifically, Angstadt, who voted against the settlement, testified in his deposition that meetings with the neighboring townships were useful in helping them form their respective positions because of what was learned about the quarry operations. Brumbach confirmed that the purpose of the meeting was to understand how the quarry operations affected Maxatawny's residents so that the Supervisors could "better frame out an agreement" with Lehigh Cement, should that become possible. R.R. 593a. Kurtz also confirmed that the purpose of the meetings was to gather information and to keep representatives of Maxatawny Township "in the loop" and to give Maidencreek Township the opportunity to "voice concerns if they had any." R.R. 524a, 537a.

Depositions of the Supervisors established that their meeting with the Citizens Group was focused on the group's practical recommendations, in the event the quarry expanded its operations. Kurtz described the meeting with the Citizens Group as an opportunity to learn. Likewise, Brumbach testified that the purpose of the meeting was "just [to] hear what people had to say." R.R. 106a.

John Keiser, a member and "spokesman" of the Citizens Group, testified that the purpose of the meeting was to communicate and explain the environmental concerns of the group. Those concerns included, *inter alia*, water quality, blasting, dust, and noise issues, as well as concerns regarding toxins being released into the environment and the impact a quarry expansion would have on a nearby creek. Keiser confirmed that he understood the meeting to be a fact-finding mission and that no vote was taken by the Supervisors. At the conclusion of the meeting, Kurtz advised him that no decision had been made.

Depositions of those at the meeting with Lehigh Cement established that this meeting was also fact-finding in nature. The Supervisors communicated the concerns and questions they had learned in their prior meetings. During the three-hour meeting, the Supervisors addressed approximately 40 issues of concern raised during the prior meetings, according to Angstadt. Some of the topics discussed in this meeting were later addressed in the settlement agreement drafted by Lehigh Cement.

In his deposition, Smith conceded that he had no knowledge that the Supervisors voted during or shortly after any of the four meetings. However, it was his theory that the Supervisors had decided to settle the litigation and scheduled the meetings to develop the terms of a settlement agreement. Nevertheless, he admitted that he was unaware of any pre-meeting "official actions," such as a vote, that might bind the Township to a settlement. R.R. 283a. Smith admitted that the official vote to accept Lehigh Cement's settlement agreement occurred at an open meeting, after the public had time to debate the terms, and that no votes on the agreement occurred in advance of the public meeting.

After discovery closed, the Supervisors filed a motion for summary judgment. In response, Smith filed a cross-motion for summary judgment. The trial court granted the Supervisors' motion and denied Smith's cross-motion. The court entered judgment in favor of the Supervisors on July 22, 2011. Smith appealed to this Court.[3]

On appeal, Smith raises one issue for our review: whether the trial court erred or abused its discretion in entering judgment in favor of Richmond Township and the Supervisors. Smith argues that the Supervisors' closed meetings violated the Sunshine Act, thereby nullifying the Township's settlement with Lehigh Cement. In support, Smith makes several arguments. First, he contends that the meetings were

---

**3.** Our standard of review of the trial court's grant of summary judgment is *de novo* and our scope of review is plenary. *Pyeritz v. Commonwealth*, —— Pa. ——, ——, 32 A.3d 687, 692 (2011). We will only overturn a trial court's entry of summary judgment if there has been an error of law or abuse of discretion. *Id.* Summary judgment is appropriate only if "there is no genuine issue of any material fact as to a necessary element of the cause of action." *Id.* (citing Pa. R.C.P. No. 1035.2(1)). Therefore it may be entered only when, after examining the record in the light most favorable to the non-moving party and resolving all doubts as to the existence of a genuine issue of material fact against the moving party, the moving party is clearly entitled to judgment as a matter of law. *Id.*

subject to the Sunshine Act because at each meeting a quorum of the Board of Supervisors deliberated on official agency business. Second, Smith contends that the meetings did not fall within any of the exceptions enumerated in the Sunshine Act for executive sessions. Finally, Smith argues the vote on May 11, 2010, taken in public did not cure the violation of the Sunshine Act caused by the four private meetings.

We begin with a review of the relevant provisions of the Sunshine Act. Section 704 of the Sunshine Act provides that

> [o]fficial action *and deliberations by a quorum of the members of an agency shall take place at a meeting open to the public* unless closed under section 707 (relating to exceptions to open meetings), 708 (relating to executive sessions) or 712 (relating to General Assembly meetings covered).

65 Pa.C.S. § 704 (emphasis added). In applying this standard of conduct, the legislature has established precise definitions of each of the key words in Section 704. Those definitions follow:

> "Agency business." The framing, preparation, making or enactment of laws, policy or regulations, the creation of liability by contract or otherwise or the adjudication of rights, duties and responsibilities, but not including administrative action.
>
> \* \* \*
>
> "Deliberation." The discussion of agency business held for the purpose of making a decision.
>
> \* \* \*
>
> "Executive session." A meeting from which the public is excluded, although the agency may admit those persons necessary to carry out the purpose of the meeting.

"Litigation." Any pending, proposed or current action or matter subject to appeal before a court of law or administrative adjudicative body, the decision of which may be appealed to a court of law.
"Meeting." Any prearranged gathering of an agency which is attended or participated in by a quorum of the members of an agency held for the purpose of deliberating agency business or taking official action.
"Official action.

> (1) Recommendations made by an agency pursuant to statute, ordinance or executive order.
>
> (2) The establishment of policy by an agency.
>
> (3) The decisions on agency business made by an agency.
>
> (4) The vote taken by any agency on any motion, proposal, resolution, rule, regulation, ordinance, report or order.

65 Pa.C.S. § 703.

The central question is whether the four private meetings at issue were "meetings" within the meaning of the Sunshine Act. It is undisputed that the meetings were prearranged and attended by a quorum of the Board of Supervisors. The question, then, is whether the meetings were "held for the purpose of deliberating agency business or taking official action." 65 Pa.C.S. § 703. Smith concedes that "official action," *i.e.,* a vote, did not take place at any of the four meetings. However, he contends that "deliberations," as defined in the Sunshine Act, did take place.

Smith argues that the Supervisors "deliberated" at these meetings because the information acquired at those meetings guided the Supervisors' evaluation and eventual vote on a settlement with Lehigh Cement. Accordingly, this information should have been presented at public

meetings. Smith believes "discussion of agency business ... for the purpose of making a decision," took place at the four meetings. 65 Pa.C.S. § 703.

 A narrow and literal reading of "deliberation," *i.e.*, discussion of agency business, would proscribe public officials from collaborative fact finding. However, this Court has never read "deliberations" so strictly. Fact-finding does not have to take place in the presence of the public. *See, e.g., Sovich v. Shaughnessy*, 705 A.2d 942, 945–946 (Pa.Cmwlth.1998) (noting the Sunshine Act does not require a public official to inquire and learn about issues only at open meetings). It has also been established that public officials have a duty to be fully informed. *Belle Vernon Area Concerned Citizens v. Board of Commissioners of Rostraver Township*, 87 Pa.Cmwlth. 474, 487 A.2d 490, 494 (1985). In short, public officials may "study, investigate, discuss and argue problems and issues" outside the confines of public meetings, even with interested parties. *Id.* (citation omitted).

Smith contends, however, that this above-referenced precedent is not dispositive. He argues that these cases were decided under an earlier version of the Sunshine Act, Act of July 3, 1986, P.L. 388, *as amended, formerly* 65 P.S. §§ 271–286.[4]

This Court's holding in *Sovich* relied upon our earlier holding in *Conners v. West Greene School District*, 131 Pa. Cmwlth. 95, 569 A.2d 978, 983 (1989). In *Conners*, a school board's decision to pass a budget with a tax increase was challenged because at the public meeting on the budget, the board members recessed for a private discussion. This court agreed with the trial court that even if the board members discussed the budget privately it did not violate the Sunshine Act because

> [t]here is a substantial difference between discussion and deliberation. A school board member is not foreclosed by the Act from discussing and debating informally with others including school board members the pros and cons of particular proposals and matters that may be on the board's agenda. The [Sunshine] Act does not prohibit a member from inquiring, questioning and learning about the budget and other school issues only at a public meeting.

*Conners*, 569 A.2d at 983 (emphasis added). Based on *Conners*, we held in *Sovich* that a borough council did not violate the Sunshine Act when it held a private meeting to discuss adjourning a meeting. They did so in order to consider rescheduling the meeting in a different location that could accommodate the larger than expected crowd. However, the vote on the rescheduling took place at a public meeting. *Sovich*, 705 A.2d at 945–46.

That *Conners* and *Sovich* were decided under the former enactment of the Sunshine Act is of no moment. The key definition of "agency business" is the same. The General Assembly could have responded to the holding in *Conners* and *Sovich* by amending the definition of "deliberation" in the revised Sunshine Act to include any and all discussions. It did not do so. *Conners* and *Sovich* remain good law on the meaning of "deliberation."

Smith argues that the purpose of the four meetings was to "make a decision," but that argument has no support in the record. The testimony of all who participated showed that the Supervisors were collecting information to allow them to

---

4. The former Sunshine Act was repealed and reenacted in codified form by the Act of October 15, 1998, P.L. 729.

make an informed decision *at some later time.* They sought this information in the event the opportunity to settle the case might develop in the future.

Smith directs us to *Trib Total Media, Inc. v. Highlands School District,* 3 A.3d 695 (Pa.Cmwlth.2010), *appeal denied,* 611 Pa. 648, 24 A.3d 865 (2011), and *Ackerman v. Upper Mt. Bethel Township,* 130 Pa. Cmwlth. 254, 567 A.2d 1116 (1989), and argues that these cases require a reversal of the trial court. We disagree.

In *Trib Total Media,* 3 A.3d at 697, the members of a school board met in "executive session" with local business owners to discuss a property tax assessment appeal. The school board *admitted* that it had "deliberated" with the business owners during the meeting. *Id.* at 698. The school board asserted that their "executive session" with the business owners met the exception in Section 708(a)(4) of the Sunshine Act, which allows agencies to hold discussions with their attorney in a private setting. It states, in relevant part, as follows:

> An agency may hold an executive session ... [t]o consult with its attorney or other professional advisor regarding information or strategy in connection with litigation or with issues on which identifiable complaints are expected to be filed.

65 Pa.C.S. § 708(a)(4). We held that the exception invoked by the school board did not apply because that exception simply secured the attorney-client privilege. By meeting with a third party, the school board had destroyed the privilege.

*Trib Total Media* is distinguishable. The public officials conceded that they had engaged in deliberations at the non-public meeting. Here, by contrast, there is no admission by any person in attendance at any of the four meetings that they were for any purpose other than fact gathering. Although the Solicitor described the meetings as "executive sessions," in actuality they were not.[5] The meetings were con-

---

**5.** Under the Sunshine Act an "executive session" is defined as "[a] meeting from which the public is excluded...." 65 Pa.C.S. § 703. However, executive sessions can only be held for the purposes enumerated in Section 708 of the Sunshine Act. It states, in relevant part, that

> [a]n agency may hold an executive session for one or more of the following reasons:
> (1) To discuss any matter involving the employment, appointment, termination of employment, terms and conditions of employment, evaluation of performance, promotion or disciplining of any specific prospective public officer or employee or current public officer or employee employed or appointed by the agency, or former public officer or employee, ...
> (2) To hold information, strategy and negotiation sessions related to the negotiation or arbitration of a collective bargaining agreement or ... related to labor relations and arbitration.
> (3) To consider the purchase or lease of real property ...

> (4) To consult with its attorney or other professional advisor regarding information or strategy in connection with litigation or with issues on which identifiable complaints are expected to be filed.
> (5) To review and discuss agency business which, if conducted in public, would violate a lawful privilege or lead to the disclosure of information or confidentiality protected by law ...
> (6) For duly constituted committees of a board or council of trustees of a State-owned, State-aided or State-related college or university or community college or of the Board of Governors of the State System of Higher Education to discuss matters of academic admission or standings.

65 Pa.C.S. § 708(a).

The Solicitor initially believed the four meetings fell under the litigation exception for executive sessions. However, as noted, nothing in the record indicates that matters specific to the Board's handling of the Lehigh Cement litigation or settlement of the case were discussed.

ducted so that the individual Supervisors could learn about Lehigh Cement's quarry operations and listen to citizen concerns about those operations. The meetings did not constitute a "meeting" of any type governed by the Sunshine Act.

In *Ackerman,* 567 A.2d 1116, a quorum of township supervisors met with a developer who had petitioned to amend the township zoning ordinance so that he could pursue his development plan. The stated purpose of the meeting was to bring a new supervisor up to speed on the developer's petition to amend the zoning ordinance. No formal vote was cast. However, because the discussion addressed the merits of a pending amendment to the zoning ordinance, we held that the meeting should have been open to the public. Nevertheless, we affirmed the trial court's decision not to nullify the zoning ordinance amendment that was enacted sometime after the meeting.

*Ackerman* is distinguishable because there was no pending settlement or discrete proposal before the Supervisors when they undertook their fact-finding mission. The record is consistent that the Supervisors asked questions. When they met with Lehigh Cement, they asked the company to address the questions and concerns of the Citizens Group about the quarry operation. Thus, unlike *Ackerman* a distinct proposal or solution was never discussed. The Supervisors left these four meetings without an agreed upon resolution. Rather, as in *Conners,* the Supervisors heard the pros and cons of different courses of action and inquired into citizen concerns about an expansion of Lehigh Cement's quarry.

■ Fact-finding is permissible and required by public officials. *Belle Vernon,* 487 A.2d at 494. The law does not require the press and public to be present at every agency meeting. The case law has drawn

a line, however, around the meetings of public officials where a specific proposal or petition is discussed. Meetings at which such specific proposals or petitions are discussed may require the presence of the public. Here, there was no proposal available for discussion at any of the four meetings.

■ Sunshine Act cases are fact intensive. It is the plaintiff's burden to prove that official action was taken or that "deliberations" took place at a private meeting. Smith argues that if we uphold the trial court, the only way to prove unlawful "deliberation" will be by admission, as in *Trib Total Media.* This may be so. The true difficulty is that a violation of the Sunshine Act can be shown only by testimony, under oath, of those in attendance at the meeting alleged to have violated the Sunshine Act.

Depositions were taken of those in attendance at the meetings, and they were consistent. All the witnesses confirmed the description of the meetings as fact-finding in nature. Notably, those witnesses included those on all sides on the merits of the litigation and eventual settlement with Lehigh Cement, including the Citizens Group. The Supervisors themselves did not all vote to approve the settlement with Lehigh Cement. However, the Supervisors and others present agreed that the meetings were "not for the purpose" of creating a settlement agreement. Nothing in the record suggests that any of the four meetings involved negotiations on the terms of the settlement agreement that Lehigh Cement drafted and proposed.

The Supervisors' four closed-door meetings did not violate the Sunshine Act because they were held solely for informational purposes. The Supervisors did not take official action on or deliberate over Township business at those meetings.

The trial court appropriately granted judgment to the Township.

Accordingly, we affirm.[6]

### *ORDER*

AND NOW, this 5th day of October, 2012, the order of the Court of Common Pleas of Berks County, dated July 22, 2011, in the above-captioned matter is hereby AFFIRMED.

---

**6.** In light of our stated reasons for affirming the trial court's order, we need not address Smith's remaining arguments.